IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| STEVEN REID-DOUGLAS, | : | Case No. 4:09-cv-00576 |
| Plaintiff | : | |
| | : | (Judge Brann) |
| v. | : | |
| | : | |
| JOHN MAYER, et al. | : | |
| Defendants. | : | |

**MEMORANDUM**

November 8, 2013

For the reasons that follow, the motions of defendants Cona J. Conaboy, Ruth Coulthard, John Mayer, Mike Moskwa, Jr., and Mike Mallick for summary judgment are denied; and the motions of Alexia Moritzkat, Correctional Care, Inc., and Lackawanna County Prison for summary judgment are granted, in accordance with the accompanying Order of this date.

**I. General Background**

On May 27, 2010, plaintiff Steven Reid-Douglas, an inmate at Lackawanna County Prison (hereinafter, the "county prison"), filed an amended complaint alleging that defendants Conaboy, Coulthard, and Moritzkat, registered nurses with

1

Correctional Care, Inc. (hereinafter, "Correctional Care"), the provider of medical care at the county prison; and defendants Mayer, Moskwa, and Malick, correctional officers at the county prison, violated Reid-Douglas's Eighth Amendment rights by inflicting upon him cruel and unusual punishment. In short, Reid-Douglas alleges that the defendants were deliberately indifferent to a severe medical need – torsion and infarction of Reid-Douglas's testicle – and that this indifference caused unnecessary pain and suffering, and made it necessary to surgically remove Reid-Douglas's testicle, resulting in his sterility. In addition to the individual defendants, Reid-Douglas named Correctional Care and the county prison as defendants. He seeks relief pursuant to 42 U.S.C. § 1983, which provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

On July 9, 2012, Conaboy, Coulthard, Moritzkat, and Correctional Care moved for summary judgment (ECF No. 170); Mayer, Moskwa, Malick, and the county prison moved for summary judgment on August 6, 2012 (ECF No. 181).

## II. Summary Judgment Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" where it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" where "the evidence is such that a reasonable jury," giving credence to the evidence favoring the nonmovant and making all reasonable inferences in the nonmovant's favor, "could return a verdict for the nonmoving party." Id.

For movants and nonmovants alike, the assertion "that a fact cannot be or is genuinely disputed must" be supported by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Thus, where the moving party's motion is properly supported and his evidence, if not controverted, would entitle him to judgment as a matter of law, the

nonmoving party, to avoid summary judgment in his opponent's favor, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250. In the face of the moving party's evidence, the nonmoving party's mere allegations, general denials or vague statements will not create a genuine factual dispute. See Bixler v. Cent. Pennsylvania Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993). Only citation to specific facts is sufficient. Anderson, 477 U.S. at 250.

Where the nonmoving party has had adequate time for discovery and will bear the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," and summary judgment is warranted. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

## III. Facts

The material facts of Reid-Douglas's miserable holiday season of 2008 are largely undisputed, but there are some discrepancies of consequence. The version of events submitted by the defendants goes roughly as follows, but where there are conflicts with Reid-Douglas's version, the Court substitutes the facts as related by Reid-Douglas.

4

On December 23, 2008, Reid-Douglas was living in the Restricted Housing Unit of the Lackawanna County Prison, as he had since August of that year. (Officer Facts, Aug. 6, 2012, ECF No. 182 ¶ 3 (hereinafter, "Officer Facts")). Reid-Douglas was an uncooperative inmate with a habit of kicking his door to set off a sensor, unnecessarily inviting response from the corrections officer on duty. (Officer Facts ¶ 4).

Around noon on December 23, 2008, Reid-Douglas felt pain in his testicle. (Officer Facts ¶ 6). Although his cell featured an "emergency button" that he was to push in such circumstances, Reid-Douglas did not push it. (Id. ¶ 7). He claims that it would have been painful to get out of his bed to reach the button and that, in any case, officers "won't answer the buttons . . .. You press the button, they just turn them off . . .." (Reid-Douglas Dep., ECF No. 182-1 at 20-21, 56 (hereinafter, "Reid-Douglas Dep.")). Instead, he alerted his neighbor, Saunders, that he needed medical assistance. (Reid-Douglas Dep. at 16). Saunders kicked at his own cell door to get attention, eventually kicking it open, which brought Saunders to the attention of an officer and allowed Saunders to relay Reid-Douglas's need for assistance. (Id. at 17).

Defendant officer Mayer came to Reid-Douglas's cell some time in the early afternoon, finding Reid-Douglas lying on the floor. (Officer Facts ¶ 8). Reid-

5

Douglas complained of "excruciating pain" in his testicle and requested medical examination. (Id.; Reid-Douglas Dep. at 17). Mayer offered some off-color jokes instead (Reid-Douglas Dep. at 17-18), which Reid-Douglas – understandably, given his condition – did not find amusing, and then Mayer left. (Id. at 18). After an hour or hour-and-a-half, Reid-Douglas again rousted Saunders to call for help. (Id. at 19). Saunders kicked his door, and an officer Black responded. After speaking with Reid-Douglas, who again explained that his testicle was causing "excruciating pain," Black informed the county prison's medical department (Correctional Care) that Reid-Douglas needed attention. (Id.). Black went away and Mayer came to escort Reid-Douglas to Correctional Care around 1:30 or 1:45 p.m. (Id. at 20).

Having been refused a wheelchair, Reid-Douglas limped through the halls to Correctional Care, where defendant nurses Conaboy and Coulthard spoke with Reid-Douglas, asking him how his pain had come about, where it was, and its severity. (Officer Facts ¶ 10; Reid-Douglas Dep. at 23). He explained that he was experiencing "excruciating pain" in his right testicle and that the testicle was beginning to swell. (Reid-Douglas Dep. at 22). Mayer was present, and offered his lay opinion that Reid-Douglas might not be in such pain if he had not been kicking his cell door. (Id.). Nurse Coulthard then asked Reid-Douglas whether he had been

6

kicking his cell door. (Id.). Reid-Douglas then denied (as he does today) that he had been kicking his cell door, and accused Mayer of lying. (Id. at 21-22, 70). Nurse Coulthard then said to nurse Conaboy, "We'll just give him some Motrin." (Id.). Nurse Coulthard dispensed Motrin to Reid-Douglas, told him to stop kicking his cell door, and sent him away. (Id. at 24). The interaction lasted approximately five minutes. (Id.).

With Reid-Douglas back in his cell vainly waiting for the Motrin to achieve analgesia, the next shift for the corrections officers began. While doing his first "rounds" at approximately 3 p.m., defendant officer Moskwa came by Reid-Douglas's cell. (Id. at 25). Reid-Douglas told Moskwa that he (Reid-Douglas) was in "excruciating pain," that his testicle was swollen, that he had seen Correctional Care "earlier and they didn't do [sic] nothing for me," and that he needed to see someone in the medical department again. (Id.). Moskwa told Reid-Douglas that he (Moskwa) would contact Correctional Care, but over the balance of his shift, during which Reid-Douglas repeated his plea multiple times, Moskwa did not bring Reid-Douglas to Correctional Care. (Id. at 27).

At 9 or 10 p.m. that night, a "nurse Jean" (not a defendant) came to Reid-Douglas's cell to dispense his regular medication, Elavil. (Id. at 27-28). Reid-Douglas told her of his condition and she responded that he should submit a "sick

7

call slip." (Id. at 28). But Reid-Douglas did not have a sick call slip in his possession and paperwork (grievance, request, and sick call forms) would not be distributed until the morning. (Id. at 29).

Night passed ungently and on the morning of December 24, 2008, defendant officer Mallick went cell to cell with breakfast trays. (Id.). Reid-Douglas told Mallick that he (Reid-Douglas) needed to see someone in the medical department because his testicle was swollen and hard as a golf ball. (Id.). Reid-Douglas also filed a sick call slip (actually a "grievance" form with "grievance" crossed out and the words "emergency" and "sick call" substituted, because actual sick call slips were unavailable) in the morning or early afternoon, writing "I need to see the doctor ASAP. One side, specifically my right side, of my testicle is bigger than the left and is in excruciating pain. I can barely walk and Motrin is not helping." (Id. at 30, 32). Reid-Douglas gave the slip to a member of Correctional Care on rounds. (Id. at 33). Correctional Care did not provide care in response to the sick call slip (if it was indeed the sick call slip that prompted care) until three days later on December 27, 2008 (Reid-Douglas's regular experience was to wait 1-2 days for care after filing a sick call slip). (Id. at 35-36, 73). Despite directing repeated requests to go to the medical department to officer Mallick throughout the day of December 24, 2008, Reid-Douglas was never admitted. (Id. at 33).

8

On December 25, 2008, Reid-Douglas repeated his complaints to officers Tulutto and Maloney; that evening around 8 p.m. the officers took him to Correctional Care to see defendant nurse Moritzkat. (Id. at 37). Reid-Douglas told her of his malady, and nurse Moritzkat physically examined Reid-Douglas for the first time, noticing that one of his testicles was bigger than the other. (Id.). She took a urine sample, dispensed Tylenol, and put Reid-Douglas on the list to see a doctor two days later on December 27, 2008. (Id. at 38, 96).

The morning of December 26, 2008, Reid-Douglas submitted another sick call slip, to no avail. (Id. at 39). When defendant nurse Coulthard came around to dispense his Elavil, Reid-Douglas repeated his woes to her; she said to file a sick call slip. (Id. at 40).

Finally, on December 27, 2008, around 1 p.m., nurse practitioner Ianuzzi examined Reid-Douglas thoroughly, recognizing that Reid-Douglas's testicle was undergoing torsion. (Officer Facts ¶ 16). An ultrasound was performed and approximately an hour-and-a-half later Reid-Douglas was transported to Moses Taylor Hospital for further diagnosis. (Reid-Douglas Dep. at 42; Pl. Supp. Facts, Nov. 26, 2012, ECF No. 206 ¶ 45 (hereinafter, "Pl. Supp. Facts")). It was found that Reid-Douglas had an infarcted right testicle, which was surgically removed that evening. ( Officer Facts ¶ 17). Reid-Douglas stayed in the hospital for two

more days. (Reid-Douglas Dep. at 44). Doctor Stefanelli, who performed the surgery, later said that it was "evident . . . that Mr. Reid-Douglas had a significant scrotal process going on for a few days. It is likely he had a missed torsion, which resulted in an infarction of the testicle." (Pl. Supp. Facts ¶ 71).

Notwithstanding his unfortunate experience, Reid-Douglas admits that the county prison trains its correctional officers to obtain medical care for prisoners in need. (Officer Facts ¶ 21.1). The officers are trained to notify Correctional Care personnel (at least one healthcare professional is on duty at all times) whenever a prisoner complains of pain or wants to see a healthcare professional. (Id. ¶ 21.2-3). In addition, Correctional Care nurses distribute medicine to cells four times a day, and prisoners can communicate with them. (Id. ¶ 21.4). Correctional Care's "Responding to Request for Medical Assistance Practice Guideline" (hereinafter, the "Practice Guideline") (Pl. Ex., ECF No. 200-15) provides that nurses should respond to an officer's request for medical assistance by asking the ailing prisoner about his medical problem, learning the history of the problem, physically examining the prisoner, and reviewing the prisoner's medical records. Once this is done, the nurse is to make a decision – the Practice Guideline gives as examples, "Have patient submit sick call request?"; "Treat patient based on established practice guidelines?"; and "Send patient out for immediate hospital evaluation?"

**IV.     Discussion**

To succeed on his claim, Reid-Douglas "must demonstrate (1) that the defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). See also Estelle v. Gamble, 429 U.S. 97, 105 (1976) ("[D]eliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.").[1] No one here disputes that Reid-Douglas's needs were serious. See Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987) ("[W]here denial or delay causes an inmate to suffer a life-long handicap or permanent loss, the medical need is considered serious."). The controversy surrounds the issue of whether a reasonable jury could find that the defendants were deliberately indifferent to his serious needs.

Deliberate indifference to a prisoner's medical need must be distinguished from mere negligence or malpractice. See Estelle, 429 U.S. at 105-06 ("inadvertent failure to provide adequate medical care cannot be said to constitute" a violation of

---

[1] It may be that Reid-Douglas was a pre-trial detainee, not a convict, when his ordeal occurred. (See Officer Supp. Br., Aug. 6, 2012, ECF No. 183, at 21). Although pre-trial detainees and convicts are protected by different Constitutional amendments (in the case of convicts, the Eighth Amendment; in the case of pre-trial detainees, the due process clause), the level of protection appears to be the same. See Boring v. Kozakiewicz, 833 F.2d 468, 472 (3d Cir. 1987).

11

the Eighth Amendment). A prison official cannot be said to have been deliberately indifferent to a prisoner's medical need unless "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). The United States Court of Appeals for the Third Circuit has found deliberate indifference "in a variety of circumstances, including where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." Rouse, 182 F.3d at 197.

"While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990). "Implicit in this deference to prison medical authorities," however, "is the assumption that such an informed judgment has, in fact, been made." Inmates of Allegheny Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979) (Rosenn, J.).

With these principles in mind, the Court considers Reid-Douglas's evidence

against each defendant.

### (a). Officer John Mayer.

The Court denies officer John Mayer's motion for summary judgment. As Reid-Douglas tells it, rather than heeding Reid-Douglas's request for medical assistance on December 23, 2008, Mayer made his (Reid-Douglas's) apparent pain and suffering the subject of a few abortive jokes and walked off. Only after officer Black spoke with Reid-Douglas an hour or hour-and-a-half later and arranged an appointment with Correctional Care did Mayer perform the instrumental task of escorting Reid-Douglas (sans the wheelchair Reid-Douglas sought) to medical personnel.

If this were Mayer's only involvement, he could arguably be entitled to summary judgment. See Ware v. Zeller, 214 F. App'x 363, 366 (5th Cir. 2006) ("although [the officer] allegedly was slow to respond initially and purportedly accused [the prisoner] of faking, he did not utterly ignore [the prisoner's] complaints or fail to render any assistance; thus, he did not exhibit deliberate indifference"). But it was not. Mayer proceeded to undermine Reid-Douglas's visit with nurses Coulthard and Conaboy, turning the nurses against Reid-Douglas by

falsely asserting that his own misconduct caused the injury he complained of.[2] By falsely suggesting that Reid-Douglas caused his own injury by kicking his cell door, moreover, Mayer may have misled nurses Coulthard and Conaboy to believe that Reid-Douglas's injuries were less serious than they were in reality, with the result that the nurses wrongly assumed that Motrin would be sufficient treatment.

Mayer disputes various aspects of Reid-Douglas's factual account, e.g., "I did inform the Nurse that the Plaintiff had recently been kicking the door of his cell. I thought this was relevant because it might relate to the cause of his groin pain." (Officer Facts ¶ 22.5). But the jury, of course, could disbelieve Mayer's account of his actions and intent, and might instead find that the circumstantial evidence compels the inference that Mayer recognized that Reid-Douglas's health was at serious risk and was deliberately indifferent to such risk because, for example, he sought subtle revenge against a problem prisoner. Accordingly, officer Mayer's motion for summary judgment must be denied.

### (b) Nurses Coulthard and Conaboy

The Court denies the motion for summary judgment of nurses Coulthard and Conaboy. The nurses argue that their decision to return Reid-Douglas back to his

---

[2]The Court is not suggesting that a nurse should be less solicitous of a prisoner who has caused his own injury, only that the natural tendency is such.

cell with a Motrin on December 23, 2008, was an exercise of medical judgment – malpractice at worst, but not a Constitutional violation. (See Nurse Supp. Br., July 9, 2012, ECF No. 171 at 7). The Court disagrees. Considering the evidence showing that the nurses did not physically examine Reid-Douglas (contrary to Correctional Care's Practice Guideline) and may have harbored animus towards him as a result of Mayer's allegations, a reasonable jury could conclude that the nurses abdicated their responsibility to exercise judgment altogether. Moreover, even if the nurses's course could be called an exercise of judgment, a reasonable jury could conclude that it was not an exercise of <u>medical</u> judgment. In other words, the circumstantial evidence puts the intent behind the nurses's inadequate care for Reid-Douglas in question.[3] As the Third Circuit has explained:

> [I]f we assume that [the prisoner] received inadequate medical care, [the medical professional's] intent becomes critical: if the inadequate care was a result of an error in medical judgment . . . , [the prisoner's] claim must fail; but, if the failure to provide adequate care . . . was deliberate, and motivated by non-medical factors, then [the prisoner] has a viable claim. It is therefore important that the trier of fact hear [the medical professional's] testimony in order to assess his credibility, and that [the prisoner's] counsel be permitted to explore the [the medical professional's] motivation on cross-examination.

Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993). See also Neal v. Butts, 2008

---

[3]The evidence against Coulthard is especially damning in that she heard Reid-Douglas's complaints again on December 26, 2008, and told him to submit a sick call slip.

WL 2704663, at *8 (E.D. Mich. 2008) (Order Accepting Mag.'s Report and Recommendation) ("While [nurse] arguably provided some treatment to plaintiff [suffering from testicular torsion] by telling him to use a warm rag and take aspirin, that treatment was only meant to be temporary and [nurse] completely failed to follow up on it. Moreover, [nurse's] advice was made without actually examining or speaking to plaintiff. . . . [A] rational trier of fact could find for plaintiff and, therefore, there is a genuine issue for trial."). Accordingly, the motion for summary judgment of nurses Coulthard and Conaboy must be denied.

### (c) Officers Moskwa and Mallick

The motion for summary judgment of officers Moskwa and Mallick is likewise denied. The primary thrust of the officers's argument for summary judgment – that "[t]he alleged delay in treatment . . . was relatively minimal given the circumstances" (Officer Supp. Br., Aug. 6, 2012, ECF No. 183 at 26 (hereinafter, "Officer Supp. Br.")) – goes nowhere. On top of being callous in light of the officers's lack of "skin-in-the-game," the officers argument ignores analogous caselaw showing that Reid-Douglas's ordeal was relatively protracted and that, moreover, the defendant prison officials in these cases involving less egregious inattention were not relieved of liability for their (alleged) deliberate indifference despite the overall "minimal delay." See Ware, 214 F. App'x at 365-

16

66 (pain began November 20, 1999; prisoner's surgery for testicular torsion performed November 22, 1999; vacating grant of summary judgment for a nurse Henly); Wright v. Staheli, 2009 WL 2883011, at *2 (D. Utah 2009) (pain began December 23, 2006; prisoner's surgery for testicular torsion performed December 27, 2008; denying a nurse Staheli's motion for summary judgment); Neal, 2008 WL 2704663, at *1 (pain began March 5, 2006; prisoner's surgery for testicular torsion performed March 7, 2006; denying summary judgment motions of two nurses).

As to the officers's claim that they played "no role whatsoever in treatment decisions" (Officer Supp. Br. at 26), a reasonable jury could disagree by finding that the officers were responsible for making the all-important threshold decision of whether to seek medical treatment on a prisoner's behalf vel non. To the extent the officers are inarticulately arguing that they played "no role" because Reid-Douglas was "under the care of medical experts" and thus that the officers were "justified in believing that [Reid-Douglas] was in capable hands" when they ignored his repeated requests for medical assistance throughout December 23-24, 2008, see Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004) (Becker, J.), there is at best conflicting evidence on the issues of whether Reid-Douglas's condition was in fact being monitored, and whether the officers believed he was being cared for.

Because a reasonable jury could find that officers Moskwa and Mallick recognized that Reid-Douglas's health was at serious risk and were deliberately indifferent to such risk,[4] their motions for summary judgment must be denied.

**(d)   Nurse Moritzkat**

The Court reaches a different conclusion with respect to nurse Moritzkat and will grant her motion for summary judgment. Reid-Douglas presents no evidence to indicate that nurse Moritzkat was deliberately indifferent to his needs. His testimony reveals, rather, an exercise of medical judgment, albeit poor judgment – "she physically examined me"; "she said she noticed that my testicle was, in fact, bigger than the other one"; "what she said was maybe Motrin isn't going to help and she said she's going to put me on Tylenol"; "[s]he said she was going to put me on the doctor's list to see the doctor." (Reid-Douglas Dep. at 37-38). Without any evidence putting nurse Moritzkat's intentions in doubt, no reasonable jury could infer her deliberate indifference. See Durmer, 991 F.2d at 69 n.13 ("We do not mean to suggest that a plaintiff is entitled to a trial anytime he can present a genuine issue of fact as to whether the care provided was adequate. Clearly, there

---

[4]Again, this inference gains support from the officers's identification of Reid-Douglas as a problem prisoner. (See Moskwa Aff. ¶ 5 ("Plaintiff has threatened physical violence against me and other correctional officers on repeated occasions.")).

must also be a genuine issue of fact regarding the defendant's intent.").
Accordingly, nurse Moritzkat's motion for summary judgment must be granted.

**(e)     Correctional Care and the County Prison**

The Court likewise grants the motions for summary judgment of Correctional Care and the county prison. Reid-Douglas concedes that defendants "have established a valid argument with regard to a dismissal of the Lackawanna County Prison" (Pl. Opp'n Br., Nov. 26, 2012, ECF No. 207 at 22), and makes no argument for Correctional Care's liability (Pl. Opp'n Br., Nov. 19, 2012, ECF No. 201). Having cited no evidence that would allow a reasonable jury to find that either the county prison or Correctional Care maintained a "policy or custom . . . that . . . caused the constitutional violation [he] allege[s]," Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003), Reid-Douglas's claims against them cannot prevail. Accordingly, the motions of Correctional Care and the county prison must be granted.

**V.     Conclusion**

For the foregoing reasons, the motions of defendants Cona J. Conaboy, Ruth Coulthard, John Mayer, Mike Moskwa, Jr., and Mike Mallick for summary judgment are denied; and the motions of Alexia Moritzkat, Correctional Care, Inc., and Lackawanna County Prison for summary judgment are granted, in accordance

19

with the accompanying Order of this date.

BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge